**Gabriel G. RODRIGUEZ as Administrator of the Estate of Giavanna Maria Rodriguez for the Benefit of Gabriel Gene Rodriguez and Jennifer Ann Rodriguez, Petitioner,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.**

**No. 06–559V.**

United States Court of Federal Claims.

Filed Under Seal: Jan. 22, 2010.

Reissued for Publication: Feb. 22, 2010.[1]

---

1. Vaccine Rule 18(b), found in Appendix B of the Rules of the United States Court of Federal Claims, affords each party fourteen days in which to object to the disclosure of (1) trade secrets or commercial or financial information that is privileged or confidential or (2) medical information that would constitute "a clearly unwarranted invasion of privacy." Neither party objected to the public disclosure of any information contained in this opinion.

John F. McHugh, New York, NY, and Gilbert Gaynor, Santa Barbara, CA, for petitioner.

Darryl R. Wishard, United States Department of Justice, Washington, DC, for respondent.

## OPINION AND ORDER

SWEENEY, Judge.

Petitioner seeks an award of attorneys' fees and costs under the National Childhood Vaccine Injury Act of 1986 ("Vaccine Act"), 42 U.S.C. §§ 300aa-1 to –34 (2006). In a July 27, 2009 decision, the special master awarded petitioner fees and costs in an amount significantly less than what he requested. Before the court is petitioner's motion for review of the special master's decision and petitioner's request for judicial notice. For the reasons set forth below, the court grants in part and denies in part petitioner's request for judicial notice and denies petitioner's motion for review.

## I. BACKGROUND[2]

### A. Petition for Compensation

After receiving a vaccination, Giavanna Maria Rodriguez suffered from an encephalopathy and subsequently died. *Rodriguez v.* *Sec'y of HHS*, No. 06–559V, 2009 WL 2568468, at *17 & n. 50 (Fed.Cl.Spec.Mstr. July 27, 2009). On July 31, 2006, her parents, Gabriel Gene and Jennifer Ann Rodriguez, filed a petition for compensation under the Vaccine Act.[3] *Id.* at *1. The special master conducted an entitlement hearing on May 18, 2007, in Philadelphia, Pennsylvania. *Id.* After the hearing, the special master ordered respondent to show cause why she should not find that Giavanna suffered from an injury listed on the Vaccine Injury Table ("Table"), entitling her estate to compensation.[4] *Id.* As a result, the parties negotiated a settlement and executed a joint stipulation. *Id.* In a November 27, 2007 decision, the special master memorialized the joint stipulation and awarded the agreed amount of compensation. *Id.*

### B. Application for Attorneys' Fees and Costs

Petitioner filed his initial application for fees and costs on February 28, 2008, requesting, among other things, $65,925 in fees for his attorney,[5] John E. McHugh, a solo practitioner in New York City. *Id.* at *1, 3 & n. 15. Petitioner requested that Mr. McHugh be compensated at a $450 hourly rate, which was Mr. McHugh's actual billing rate. *Id.* at *3. In her opposition to petitioner's application, respondent argued that the $450 hourly rate was unreasonable and that some of the hours claimed were improper. *Id.* at *1. Petitioner defended the $450 hourly rate in his reply brief. *Id.* However, three days later, petitioner filed an amended reply that increased the requested hourly rate to $598

---

2. In his motion for review, petitioner lodges no objections against the special master's recitation of the factual background and procedural history of this case. Thus, in this section, the court cites to the special master's decision rather than to the underlying record.

3. The case was subsequently recaptioned when Mr. Rodriguez was appointed as the administrator of Giavanna's estate. *Rodriguez*, 2009 WL 2568468, at *1 n. 2.

4. Petitioners can recover under the Vaccine Act in one of two ways: either by proving an injury listed on the Table or by proving causation-in-fact. *See* 42 U.S.C. §§ 300aa–11(c)(1)(C), –13(a)(1). Petitioners can prove a Table injury by showing that they, or the affected individual, received a vaccine listed on the Table and suffered an injury, or an acute complication or sequela of that injury, associated with that vaccine within the prescribed time period. *Id.* §§ 300aa–11(c)(*l*)(C)(i), –13(a)(1)(A). To recover under a causation-in-fact theory, petitioners must demonstrate that a vaccine listed on the Table actually caused the alleged injury. *Id.* §§ 300aa–11(c)(1)(C)(ii), –13(a)(1)(A). Respondent can rebut the presumption of a Table injury or a prima facie case of causation-in-fact if she shows that the injury was caused by factors unrelated to the vaccine. *Id.* § 300aa–13(a)(*l*)(B).

5. Petitioner also requested $4,817.48 in costs, $4,200 in unpaid expert costs, and $2,252.16 in petitioner's costs. *Rodriguez*, 2009 WL 2568468, at *1. None of these costs is at issue here.

for work performed in May 2006, $614 for work performed between June 2006 and May 2007, and $645 for work performed after May 2007. *Id.* Overall, petitioner's fee request increased to $94,642.[6] *Id.* at *1. In support of his amended fee request, petitioner submitted the declarations of his mother and Mr. McHugh, as well as copies of declarations previously filed in other Vaccine Act cases. *Id.* at *4–5. Respondent, in a surreply, requested that the special master determine a reasonable hourly rate based on her experience, but did not suggest what that reasonable rate might be. *Id.* at *1, 5. Supporting respondent's surreply was a declaration from Daniel F. Van Horn, a Deputy Chief in the Civil Division of the United States Attorney's Office for the District of Columbia.[7] *Id.* at *5.

After reviewing the parties' submissions, the special master, on July 17, 2008, directed the parties to file "additional evidence focused on negotiated hourly rates for attorneys of Mr. McHugh's skill, experience, and reputation; fees paid to attorneys in the Washington, DC area; and argument to assist in determining the relevant legal community for purposes of determining the forum rate for attorney fees." *Id.* (footnotes omitted). The special master noted that her request for information regarding hourly rates encompassing the entire Washington, DC area, rather than just the District of Columbia proper, was guided by the fact that very few attorneys in the District of Columbia represent Vaccine Act petitioners. *Id.* at *1 n. 10. In responding to the special master's order, petitioner supplied affidavits from Clifford Shoemaker, an attorney in Vienna, Virginia whose practice focuses on Vaccine Act litigation, and reserved the right to file a supplemental fee application. *Id.* at *1. Respondent attached five exhibits to her response, including one exhibit describing the hourly rates she negotiated with Professor Peter Meyers, a District of Columbia attorney engaged in Vaccine Act litigation. *Id.* at *1, 6.

At the direction of the special master, petitioner filed his supplemental fee application on May 7, 2009. *Id.* at *1. Petitioner requested $5,787.50 in fees for preparing a response to the special master's July 17, 2008 order and $4,607.50 in fees related to the supplemental fee application. *Id.* at *9. All $10,395 of these fees were incurred by Gilbert Gaynor, an attorney retained by Mr. McHugh to respond to the special master's July 17, 2008 order and whose law practice involves "complex litigation" in the federal courts of the Central District of California. *Id.* Mr. Gaynor indicated that his fee request reflected his 2008 hourly rate of $450 and 2009 hourly rate of $475. *Id.* Petitioner submitted the declarations from three attorneys in support of his supplemental fee application—those of Mr. Gaynor, Deborah Drooz, and Tarik Adlai. *Id.* In her opposition to petitioner's supplemental fee application, respondent objected to the hourly rates charged by Mr. Gaynor and suggested that the proper hourly rate was $252. *Id.* In support of her opposition, respondent submitted the declaration of attorney Daniel Rezneck. *Id.* at *6. Briefing on the supplemental fee application concluded on June 29, 2009. *Id.* at *1.

## C. Special Master's Decision and Motion for Review

The special master ruled on petitioner's application for attorneys' fees and costs, as amended and supplemented, on July 27, 2009. *Id.* at *1–24. She addressed five broad issues, three of which are relevant to the instant motion: (1) Mr. McHugh's hourly rate; (2) the reasonableness of some of the hours claimed by Mr. McHugh; and (3) Mr. Gaynor's hourly rate. *Id.* at *3–7, 9–10. Ultimately, she reduced the hourly rate requested by petitioner for Mr. McHugh's services to $310 for 2006, $320 for 2007, $330 for 2008, and $335 for 2009. *Id.* at *23. She similarly reduced the hourly rate requested by petitioner for Mr. Gaynor's services to $270 for 2008 and $275 for 2009. *Id.* at *24. Finally, she reduced the number of hours for

---

6. The amended fee request included the addition of sixteen hours for work performed preparing the amended reply. *Rodriguez,* 2009 WL 2568468, at *1.

7. The special master misidentified Mr. Van Horn as Daniel F. Horn in her decision. *See* Resp't Ex. I (declaration of Daniel F. Van Horn).

which Mr. McHugh could receive compensation. *Id.* at \*20. Given these and other reductions, she awarded petitioner $42,270 in fees for Mr. McHugh and $6,111 in fees for Mr. Gaynor. *Id.* at \*23–24. Petitioner filed a timely motion for review, to which respondent responded. While the motion for review was pending before the court, petitioner filed a request for judicial notice. The court heard argument on both motions on January 15, 2009, and is now prepared to rule.

## II. REQUEST FOR JUDICIAL NOTICE

As a threshold matter, the court addresses petitioner's request for judicial notice, which concerns the following documents: (1) a vacancy announcement for an attorney in the Office of Vaccine Litigation in the Torts Branch of the Civil Division of the United States Department of Justice, as it appeared on November 5, 2009; (2) sections 4–5.421 and 4–5.422 of the United States Attorneys' Manual, effective December 22, 2007; and (3) the decision in *Walmsley v. Secretary of HHS*, No. 06–270V, 2009 WL 4064105 (Fed. Cl.Spec.Mstr. Nov. 6, 2009). Petitioner argues that each of the documents is directly relevant to the issues before the court and contain facts not subject to reasonable dispute. In particular, he contends that the contents of the vacancy announcement and the United States Attorneys' Manual relate to the issue of the complexity of Vaccine Act litigation and that the *Walmsley* decision concerns some of the same factual and legal issues presented in this case. At oral argument, respondent objected to the taking of judicial notice of the vacancy announcement and the excerpts from the United States Attorneys' Manual, but not the *Walmsley* decision. The court takes judicial notice of the decision in *Walmsley*, but declines to do so with the other documents submitted by petitioner.

The taking of judicial notice is governed by Federal Rule of Evidence 201. Although the Federal Rules of Evidence are not formally applied in Vaccine Act proceedings, *see* 42 U.S.C. § 300aa–12(d)(2)(B); Vaccine Rule 8(b)(1); *Munn v. Sec'y of HHS*, 970 F.2d 863, 873 (Fed.Cir.1992), the United States Court of Appeals for the Federal Circuit ("Federal Circuit") has approved the taking of judicial notice in a case arising under the Vaccine Act, *see Hines ex rel. Sevier v. Sec'y of HHS*, 940 F.2d 1518, 1525–26 (Fed.Cir. 1991). The court may take judicial notice only of adjudicative facts. Fed.R.Evid. 201(a). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). The court "shall take judicial notice if requested by a party and supplied with the necessary information." Fed.R.Evid. 201(d). "Judicial notice may be taken at any stage of the proceeding." Fed.R.Evid. 201(e).

■ The court has no difficulty taking judicial notice of the *Walmsley* decision. *See, e.g., McTernan v. City of York, Pennsylvania*, 577 F.3d 521, 526 (3d Cir.2009) ("[A] court may take judicial notice of a prior judicial opinion."); *cf. Hayward v. Marshall*, 512 F.3d 536, 541 n. 5 (9th Cir.2008) (treating a request for judicial notice of two recent court decisions as citations to supplemental authority). However, taking judicial notice of the vacancy announcement and the United States Attorneys' Manual is inappropriate. Petitioner is using Federal Rule of Evidence 201 in an attempt to introduce evidence into the record that he should have presented in the first instance to the special master. The language highlighted by petitioner in the vacancy announcement has appeared in prior vacancy announcements for attorney positions in the Office of Vaccine Litigation, including those posted during the time when this case was before the special master. *See* Oral Argument, Jan. 15, 2010, at 10:50:06 (reflecting respondent's counsel's assertion that the vacancy announcement to which he responded two years ago contained similar language). Similarly, as conceded by petitioner, the cited sections of the United States Attorneys' Manual were effective well before the special master issued her decision. However, petitioner offered neither document as evidence in the proceedings before the special master.

Although the court may take judicial notice in exercising its review function, *see* Fed.R.Evid. 201(f), such an action cannot serve as "a remedy for a party's failure to introduce readily available evidence of crucial facts" before the special master, Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence Manual* § 4.05 (2009) (citing *Buchanan v. Reliance Ins. Co.* (*In re Color Tile, Inc.*), 475 F.3d 508, 510 (3d Cir.2007); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1123 n. 18 (9th Cir.2004)). Indeed, in considering a motion for review, the United States Court of Federal Claims ("Court of Federal Claims") is constrained to a review of the record before the special master. *See* 42 U.S.C. § 300aa–12(e)(2) ("Upon the filing of a motion [for review] with respect to a petition, the United States Court of Federal Claims shall have jurisdiction to undertake a review of the record of the proceedings . . . .") *cf.* *Turner ex rel. Turner v. Sec'y of HHS*, 268 F.3d 1334, 1339 (Fed.Cir.2001) ("The jurisdiction of the Court of Federal Claims to review the special master's findings of fact is thus confined to reviewing the record under the deferential standard of review in § 12(e)(2)(B)."); *Whitecotton, by Whitecotton v. Sec'y of HHS*, 81 F.3d 1099, 1108 (Fed.Cir. 1996) ("Congress desired the special masters to have very wide discretion with respect to the evidence they would consider. . . ."). Because neither the vacancy announcement nor the United States Attorneys' Manual was part of the record before the special master, the court declines to take judicial notice of them for purposes of ruling on petitioner's motion for review. Accordingly, petitioner's request for judicial notice is granted only with respect to the *Walmsley* decision. The court thus turns to petitioner's motion for review.

## III. MOTION FOR REVIEW

### A. Standard of Review

The Court of Federal Claims has jurisdiction to review the decisions of special masters in Vaccine Act cases, 42 U.S.C. § 300aa–12(e), including decisions awarding attorneys' fees and costs, Vaccine Rules 13(b), 23(a). Upon reviewing the record of

proceedings before the special master, the court may:

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2). The standards set forth in section 12(e)(2)(B) "vary in application as well as degree of deference. . . . Fact findings are reviewed . . . under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard." *Munn*, 970 F.2d at 870 n. 10. The "arbitrary and capricious" standard "is a highly deferential standard of review. If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines*, 940 F.2d at 1528; *accord Lampe v. Sec'y of HHS*, 219 F.3d 1357, 1360 (Fed.Cir.2000) ("The arbitrary and capricious standard of review is difficult for an appellant to satisfy with respect to any issue. . . ."). In contrast, under the "not in accordance with law" standard, the court reviews the special master's legal conclusions de novo. *Saunders ex rel. Saunders v. Sec'y of HHS*, 25 F.3d 1031, 1033 (Fed.Cir.1994); *cf. Perreira ex rel. Perreira v. Sec'y of HHS*, 27 Fed.Cl. 29, 32 (1992) ("On issues of law, recognition should be given to the special master's expertise in the development of the procedures in this novel Program. A decision on issues of law applicable to the Program should be overturned only when error is unmistakably clear."), *aff'd,* 33 F.3d 1375 (Fed.Cir.1994). And, an abuse of discretion occurs when a "decision is based on clearly erroneous findings of fact, is based on erroneous interpretations of the law, or is clearly unreasonable, arbitrary or fanciful." *Cybor*

*Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1460 (Fed.Cir.1998) (en banc); *accord Hendler v. United States,* 952 F.2d 1364, 1380 (Fed.Cir.1991) ("An abuse of discretion may be found when (1) the court's decision is clearly unreasonable, arbitrary, or fanciful; (2) the decision is based on an erroneous conclusion of the law; (3) the court's findings are clearly erroneous; or (4) the record contains no evidence upon which the court rationally could have based its decision."), *quoted in Murphy ex rel. Murphy v. Sec'y of HHS,* 30 Fed.Cl. 60, 61 (1993).

■■■■ With respect to an award of attorneys' fees and costs, the Vaccine Act provides:

(1) In awarding compensation on a petition ... the special master or court shall also award as part of such compensation an amount to cover—

(A) reasonable attorneys' fees, and

(B) other costs,

incurred in any proceeding on such petition. If the judgment of the United States Court of Federal Claims on such a petition does not award compensation, the special master or court may award an amount of compensation to cover petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought. 42 U.S.C. § 300aa–15(e). Because the special master adopted the parties' joint stipulation and awarded petitioner compensation, an award of reasonable attorneys' fees and costs is mandated in this case. And, of particular importance in this case, the Federal Circuit has made it clear that "the determination of the amount of reasonable attorneys' fees is within the special master's discretion."[8] *Saxton by & Through Saxton v. Sec'y of HHS,* 3 F.3d 1517, 1520 (Fed.Cir.1993); *accord Delta–X Corp. v. Baker Hughes Prod. Tools, Inc.,* 984 F.2d 410, 414 (Fed.Cir.1993) ("For good reasons, this court affords trial judges discretion to award ... attorney fees."). Accordingly, the special master's determination is "entitled to deference." *Saxton,* 3 F.3d at 1521. "However, the special master must provide sufficient findings and analysis in her opinion for the court, upon review, to determine whether there was an abuse of discretion." *Wasson by Wasson v. Sec'y of HHS,* 24 Cl. Ct. 482, 483 (1991) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).[9]

8. The Court of Federal Claims, along with its predecessor court, the United States Claims Court ("Claims Court"), has consistently applied this legal standard. *See, e.g., Morse v. Sec'y of HHS,* 89 Fed.Cl. 683, 686–87 (2009) ("The special master's determination of reasonable attorneys' fees and costs in a Vaccine Act case is a discretionary ruling that is entitled to deference from this court."); *Sabella v. Sec'y of HHS,* 86 Fed.Cl. 201, 208 (2009) ("The special master has discretion in determining the reasonable amount of attorneys' fees and costs to award petitioner."); *Carrington, by Carrington v. Sec'y of HHS,* 85 Fed.Cl. 319, 321 (2008) (noting that "[a] special master has significant discretion" in awarding attorneys' fees and costs); *Savin, by Savin v. Sec'y of HHS,* 85 Fed.Cl. 313, 315 (2008) (remarking that a special master is afforded leeway in determining the reasonable attorneys' fees and costs); *Guy v. Sec'y of HHS,* 38 Fed.Cl. 403, 405 (1997) ("A special master is given broad discretion in determining the reasonable amount of attorneys' fees and costs."); *Estrada ex rel. Anderson v. Sec'y of HHS,* 29 Fed.Cl. 78, 81 (1993) ("In reviewing a special master's decision on attorneys' fees and costs, the court allows the special master reasonably broad discretion in calculating the awards." (internal quotation marks omitted)); *Lonergan ex rel. Lonergan v. Sec'y of HHS,* 27 Fed.Cl. 579, 580 (1993) ("[T]his court must grant the special master wide latitude in determining the reasonableness of an award of attorneys' fees."); *Perreira,* 27 Fed.Cl. at 34 ("The special master is afforded wide discretion in determining the reasonableness of costs, as well as attorneys' fees."); *Hines ex rel. Sevier v. Sec'y of HHS,* 22 Cl.Ct. 750, 753 (1991) ("[T]he reviewing court must grant the special master wide latitude in determining the reasonableness of both attorneys' fees and costs."); *cf. Murphy,* 30 Fed.Cl. at 61 ("The special master's decision denying attorneys' fees or costs is reviewed under an abuse of discretion standard because the determination is based on a discretionary function allowing him to deny fees if he finds that the petition was not brought in good faith and upon a reasonable basis.").

9. In *Wasson,* the Claims Court approved the special master's methodology in determining the reasonable fees and costs but remanded the case to the special master to provide sufficient findings and analysis to allow the court to properly review her decision. 24 Cl.Ct. at 483. Once the special master provided the required detail, *Wasson, by Wasson v. Sec'y of HHS,* No. 90–208V,

## B. Petitioner's Objections

Pursuant to Vaccine Rule 24(a), petitioner enumerates three objections to the special master's award of attorneys' fees and costs:

ONE: The Special Master's Determination of the Prevailing Market Rates for Experienced Attorneys in Complex Litigation in the District of Columbia is Arbitrary, Capricious, an Abuse of Discretion, and Contrary to Law.

TWO: Post–Hearing Briefing was a Critical Stage of the Case, and the Special Master Acted Arbitrarily and Capriciously and Abused Her Discretion in Reducing Mr. McHugh's Hours for this Important Work by 45%.

THREE: The Special Master's Conclusion, in a Published Opinion, that Petitioner's Attorney's Mr. Gaynor and Mr. McHugh Engaged in "Intemperate and Ill–Considered Attacks" on Respondent is Arbitrary, Capricious, an Abuse of Discretion, and Contrary to Law, and is Likely to Chill Vigorous Advocacy by the Vaccine Act Bar.

Mot. Review & Mem. Objections ("Mot.") 1. The court addresses each objection in turn.

## C. Objection One: Petitioner's Attorneys' Hourly Rate

### 1. Legal Standards

Special masters use a two-step approach to determine the amount of reasonable attorneys' fees to award a petitioner under the Vaccine Act. *Avera ex rel. Avera v. Sec'y of HHS,* 515 F.3d 1343, 1347 (Fed.Cir. 2008). First, the special master determines the lodestar by multiplying the number of hours the attorney reasonably expended on the litigation by a reasonable hourly rate. *Id.* at 1347–48 (citing *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). Second, the special master may adjust the lodestar amount "based on other specific findings." *Id.* at 1348.

At issue here is the reasonable hourly rate awarded to petitioner for the services of Mr. McHugh and Mr. Gaynor. "[A] reasonable hourly rate is 'the prevailing market rate,' defined as the rate 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.' " *Avera,* 515 F.3d at 1348 (quoting *Blum,* 465 U.S. at 895 n. 11, 104 S.Ct. 1541). The Federal Circuit has concluded that when calculating attorneys' fees under the Vaccine Act, the hourly rate to be used should generally be the prevailing market rate of the forum, *i.e.,* "the District of Columbia, where the Court of Federal Claims, which has exclusive jurisdiction over cases arising under the Vaccine Act, is located." *Id.* at 1348–49. However, if "the bulk of the work is done outside of the District of Columbia in a legal market where the prevailing attorneys' rates are substantially lower," then the hourly rate to be used in the lodestar calculation is instead the lower out-of-forum rate. *Id.* at 1349 (adopting the exception described in *Davis County Solid Waste Management & Energy Recovery Special Service District v. U.S. EPA,* 169 F.3d 755 (D.C.Cir.1999) (per curiam)).

Petitioner bears the burden "to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with" the prevailing market rate. *Blum,* 465 U.S. at 895 n. 11, 104 S.Ct. 1541; *accord Hensley,* 461 U.S. at 437, 103 S.Ct. 1933; *Wasson,* 24 Cl.Ct. at 484; *Hines,* 22 Cl.Ct. at 755. The special master is entitled to use her "prior experience in reviewing fee applications" to reduce the charged hourly rate to a reasonable rate. *Saxton,* 3 F.3d at 1521; *accord Slimfold Mfg. Co. v. Kinkead Indus., Inc.,* 932 F.2d 1453, 1459 (Fed.Cir.1991) (noting that "a district court itself has experience in determining what are . . . reasonable fees, and should rely on that experience and knowledge if the documentation is considered inadequate").

### 2. Proceedings Before the Special Master

In his initial fee application, which concerned the services provided by Mr.

1992 WL 26662 (Fed.Cl.Spec.Mstr. Jan. 2, 1992), the Claims Court affirmed her fees and costs decision in a February 21, 1992 unpublished order. The Federal Circuit affirmed the Claims Court's February 21, 1992 decision on appeal. *See Wasson, by Wasson v. Sec'y of HHS,* 988 F.2d 131, 1993 WL 18492 (Fed.Cir.1993) (unpublished table decision).

McHugh, petitioner requested that Mr. McHugh receive fees based on an hourly rate of $450, an amount that equaled his actual hourly billing rate. *Rodriguez*, 2009 WL 2568468, at *3. Petitioner noted that a $450 hourly rate was "well below the prevailing rates for senior litigators in New York City," and that Mr. McHugh, who began handling Vaccine Act cases in 2000, was an experienced litigator with over forty years of experience. *Id.* Petitioner also contended that the $450 hourly rate was supported by the Federal Circuit's decision in *Avera*. *Id.* Respondent countered that *Avera* did not support the requested hourly rate, that the

hourly rate should be based on the rates charged in the years in which Mr. McHugh's services were provided, and that, in any event, his hourly rate should mirror the $350 rate that he had received in an earlier Vaccine Act case—*Kantor v. Secretary of HHS*, No. 01-679V, 2007 WL 1032378 (Fed.Cl. Spec.Mstr. Mar. 21, 2007). *Rodriguez*, 2009 WL 2568468, at *4.

■■■ Petitioner subsequently amended his fee request, contending that Mr. McHugh's hourly rate should equal the rate charged by senior partners in major Washington, DC law firms, as reflected by the adjusted *Laffey* matrix.[10] *Id.* He advanced three reasons

---

**10.** The *Laffey* matrix is a schedule of "the prevailing rates in the community for lawyers of comparable skill, expertise and reputation in complex federal litigation" approved for use in a Title VII employment discrimination case by the United States District Court for the District of Columbia ("D.C. District Court"). *Laffey v. Nw. Airlines, Inc.*, 572 F.Supp. 354, 371–75 (D.D.C. 1983), *aff'd in part, rev'd in part*, 746 F.2d 4 (D.C.Cir.1984); *cf. Rodriguez*, 2009 WL 2568468, at *6 (describing the contents of the declaration of Mr. Rezneck, one of the attorneys assigned to litigate the fee application in *Laffey* on the plaintiffs' behalf). The matrix describes "hourly rates for lawyers of differing levels of experience[.]" *Laffey*, 572 F.Supp. at 371. Although the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") reversed the D.C. District Court's determination of the reasonable hourly rate in *Laffey* on appeal, it later approved of the use of the *Laffey* matrix in an en banc opinion. *See Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1525 (D.C.Cir.1988) (en banc) ("We do not intend . . . to diminish the value of the fee schedule compiled by the District Court in *Laffey*. Indeed, we commend its use for the year to which it applies."). The *Laffey* matrix included hourly rates for work performed prior to July 1983. *Laffey*, 572 F.Supp. at 360, 375; *see also Save Our Cumberland Mountains, Inc.*, 857 F.2d at 1525 (commending the use of the *Laffey* matrix "for the year to which it applies" and remanding the case to the district court to determine the "reasonable hourly rates at the time the services were performed"). For subsequent years, the D.C. Circuit has approved the use of two different matrices within its circuit as evidence of "the prevailing market rates in the relevant community for attorneys of reasonable comparable skill, experience, and reputation." *Covington v. District of Columbia*, 57 F.3d 1101, 1108–09 (D.C.Cir.1995); *see also DL v. District of Columbia*, 256 F.R.D. 239, 242–43 (D.D.C.2009) (describing the two matrices); *cf. Rodriguez*, 2009 WL 2568468, at *5 (noting that Mr. Van Horn, the individual currently tasked with updating the matrix for the Civil Division of the United

States Attorney's Office for the District of Columbia, explained that the matrix he prepares is distinct from the so-called adjusted *Laffey* matrix).

First, some judges on the D.C. District Court have used a matrix developed by the Civil Division of the United States Attorney's Office for the District of Columbia. *See e.g., Blackman v. District of Columbia*, 59 F.Supp.2d 37, 43 (D.D.C. 1999) (using the matrix as a "point of reference" for determining reasonable hourly rates), *abrogated in part on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). This matrix is used in cases involving a fee-shifting statute that permits a prevailing party to recover reasonable attorneys' fees. Resp't Ex. I at ¶ 5. The hourly rates are revised each year "by adding the increase in the Consumer Price Index for All Urban Consumers for the Washington, D.C. area to the corresponding rates for the prior year, . . . subject to further adjustment to ensure" consistency. *Id.* ¶ 4.

Second, other judges of the D.C. District Court have used an updated version of the *Laffey* matrix that adjusts the hourly rates for each year based on the legal services component of the nationwide Consumer Price Index. *See, e.g., Salazar v. District of Columbia*, 123 F.Supp.2d 8, 13–15 (D.D.C.2000) (concluding that the updated *Laffey* matrix more accurately reflected "the prevailing rates for legal services in the D.C. community."). Of course, it bears noting that in certain situations, the D.C. District Court has declined to adopt either matrix. *See, e.g., Agapito v. District of Columbia*, 525 F.Supp.2d 150, 155 (D.D.C.2007) (concluding that the matrix prepared by the United States Attorney's Office for the District of Columbia did not apply to simple administrative proceedings under the Individuals with Disabilities Education Improvement Act of 2004 ("IDEIA")); *Muldrow v. Re-Direct, Inc.*, 397 F.Supp.2d 1, 4–5 (D.D.C.2005) (concluding that the *Laffey* matrix did not apply in a "relatively straightforward negligence suit" and accordingly reducing the attorneys' fees

why Mr. McHugh was entitled to these higher rates. First, he argued that the hourly rate received by Mr. McHugh in *Kantor* was "'ridiculously low'...." *Id.* (quoting Mr. McHugh's declaration). Second, he contended that because "respondent's frequent challenges to attorneys' fees and expert fees" discouraged attorneys from accepting Vaccine Act cases, Mr. McHugh should be rewarded for agreeing to represent him. *Id.* Third, he maintained that respondent's refusal to concede that Giavanna suffered from a Table injury entitled Mr. McHugh to full compensation. *Id.* In response to petitioner's contentions, respondent reiterated her objection to the $450 hourly rate and challenged the applicability of the adjusted *Laffey* matrix to determining the forum rate in Vaccine Act cases. *Id.* at *5.

In response to the special master's July 17, 2008 request for further evidence and argument, petitioner repeated his position that the adjusted *Laffey* matrix constituted the applicable forum rate, or at least provided "'highly probative evidence of the forum rate in the District of Columbia.'" *Id.* (quoting petitioner's response). Respondent again argued that the *Laffey* matrix "did not represent the appropriate forum rate" and that "petitioner had failed to produce sufficient evidence of what constituted the forum rate...." *Id.* at *6.

Finally, in his supplemental attorneys' fees application, petitioner asserted that the adjusted *Laffey* matrix constituted the applicable forum rate for Mr. Gaynor's services. *Id.* Respondent again declared the adjusted *Laffey* matrix inapplicable to Vaccine Act cases. *Id.*

 The special master outlined the following framework for determining the proper hourly rate for petitioner's attorneys:

> Based on *Avera* ..., it is clear that the analysis must begin with a determination of the forum rate. Once the forum rate is determined, then, if the bulk of the work was performed outside the forum, the analysis may shift to the market rate. Only if the "bulk of the work" exception to the forum rate applies is it then necessary to

award based on the *Laffey* matrix by twenty-five

determine the rate of compensation in the legal marketplace where that work was performed, in order to determine if the *Davis* exception to the forum rule applies.

*Id.* at *10. As a preliminary matter, the special master concluded that the neither the *Laffey* matrix nor the adjusted *Laffey* matrix constituted the forum rate for Vaccine Act cases. *Id.* at *11–12. She first noted that although petitioner "treated the applicability of the *Laffey* Matrix as a foregone conclusion," the Federal Circuit expressly left open the issue in *Avera. Id.* at *11. She then explained that the *Laffey* matrix "is a court-created mechanism to streamline the issue of reimbursement of attorney fees in fee-shifting cases tried in the U.S. District Court for the District of Columbia," and that "[t]here are significant differences between the litigation in which the *Laffey* Matrix is applied and Vaccine Act litigation." *Id.* The differences highlighted by the special master included the streamlined and simplified procedures in the no-fault Vaccine Act litigation and the fact that the Vaccine Act lacks a prevailing party requirement, making a denial of attorneys' fees and costs unlikely so long as the petition was filed in good faith and on a reasonable basis. *Id.* She summarized:

> The *Laffey* Matrix does not represent the prevailing market rate as defined by the Supreme Court in *Blum*: that rate paid in the community for "similar services by lawyers of reasonably comparable skill, experience, and reputation." The *Laffey* Matrix applies to complex litigation in which one must prevail in order to receive fees at all; discovery disputes abound; the rules of evidence apply; and, if litigated rather than settled, may be tried to a jury, rather than before a special master who hears only vaccine injury cases. None of these factors apply in Vaccine Act litigation.

*Id.* (citation & footnotes omitted). The special master concluded that petitioner "failed to show that the services provided in civil cases tried in the U.S. District Court for the District of Columbia are similar to Vaccine Act litigation, or that his [attorneys'] skill

percent to ensure reasonableness).

and reputation are similar to those counsel who command the *Laffey* Matrix rates he requests." *Id.* at *12.

Having rejected the *Laffey* matrix as constituting the forum rate for Vaccine Act attorneys' fees, the special master turned to determining what was, in fact, the forum rate. *Id.* at *13–15. She analyzed the following evidence in detail, addressing both the advantages and disadvantages of using the evidence to establish a forum rate: (1) information "concerning the agreed-upon rate of compensation" ($240 per hour for 2008) for Professor Meyers, the "one Vaccine Act attorney who provides the bulk of his services within the District of Columbia," *Id.* at *13; (2) an order in *Flannery v. Secretary of HHS* directing respondent to show cause why petitioner's counsel, an experienced tort attorney and senior partner at a Washington, DC law firm, should not receive fees based on a $300 hourly rate for work performed between 2001 and 2003, *id.* at *7 & n. 19, 13 (citing No. 99–963V, 2004 WL 2397590 (Fed.Cl. Spec.Mstr. Oct. 12, 2004)); (3) a cost of living index supplied by petitioner, *id.* at *13–14; (4) information "regarding a nationwide sampling of law firm billing rates, including Washington, DC area firms," supplied by petitioner,[11] *id.* at *13; (5) the *Laffey* matrix

and the adjusted *Laffey* matrix, *id.* at *14; and (6) rates "charged and received by other attorneys handling Vaccine Act cases," including those "negotiated for two small firms" in Boston, Massachusetts and Vienna, Virginia, *Id.*

The special master found the *Flannery* order, combined with the cost of living index, to be the most probative of the forum rate for Vaccine Act cases. *Id.* at *13. She noted that although the order did not indicate the hourly rate ultimately awarded to the attorney in that case, *id.* at *15, it "provided an indication of what rate an experienced Washington, DC tort litigation attorney requested for a Vaccine Act case and the view of the special master in that case that the rate was reasonable," *id.* at *13. With the appropriate cost of living adjustment, the "2009 'forum rate' for a similarly qualified attorney would not exceed $360.00 per hour." *Id.* (footnote omitted).

The special master then found that "[t]he information pertaining to Professor Meyers was less valuable" due to his representation of "Vaccine Act petitioners through a law school clinical practice" and associated lack of overhead expenses. *Id.* Nevertheless, not-

---

11. The information provided by petitioner was published in *The National Law Journal* on December 10, 2007, and was derived from survey responses from some of the nation's largest law firms. *See* Am. Reply Mem. Ex. O. The data for each firm included the number of attorneys at the firm and the hourly rates for partners and associates. *See id.* The six entries for Washington, DC law firms were as follows:

Arent Fox (329)
Partners $395–$675
Associates $240–$440

Covington & Burling (608)
Partners $510–$800
Associates $240–$525

Dickstein Shapiro (388)
Partners $425–$825 (average $552) (median $550)
Associates $225–$440 (average $336) (median $360)
Firmwide (average $438) (median $425)

Hogan & Hartson (1,092)
Partners $300–$850 (average $600) (median $590)
Associates $150–$525 (average $385) (median $370)
Firmwide (average $490)

Patton Boggs (518)
Partners $320–$920 (average $536) (median $525)
Associates $205–$520 (average $375) (median $385)
Firmwide (average $456) (median $455)

Wilmer Cutler Pickering Hale and Dorr (1,051)
Partners $475–$1,000
Associates $215–$495

*Id.*

ed the special master, the hourly rate received by Professor Meyers was more than that received by other Vaccine Act attorneys and that, "[i]n general, attorneys who have roughly similar years of practice and experience in Vaccine Act litigation have been awarded hourly rates of between $250–350.00 ... for work performed in the last two years, although attorneys who practice in lower cost areas of the nation have been awarded lower rates." *Id.* at *13 n. 43.

With respect to the nationwide sampling of law firm billing rates supplied by petitioner, the special master concluded that it did "not provide sufficient detail concerning the nature of these law firms' practice areas to offer much guidance on the forum rate in Vaccine Act cases," such as whether the law firms "engage in similar litigation" or whether the "senior partners in these firms practice law of the same degree of complexity or with the same degree of skill as Mr. McHugh." *Id.* at *13. Similarly, with respect to the *Laffey* matrix and adjusted *Laffey* matrix, the special master concluded that petitioner "failed to demonstrate that either matrix represents fees for work sufficiently comparable to Vaccine Act litigation so as to constitute sufficient evidence of a reasonable hourly rate in this case." *Id.* at *14.

Finally, the special master discussed the rates charged and received by other attorneys handling Vaccine Act cases. *Id.* She acknowledged first that "[b]ecause *Avera* ... changed the focus from the geographic rule previously used in the lodestar calculation to the forum rate, decisions issued prior to *Avera* ... awarding specific hourly rates must be viewed with some caution, as they may be based on evidence of the geographic rate for the attorneys involved." She also acknowledged that although "[t]he rates negotiated between Vaccine Act petitioners' counsel ... and the Department of Justice are informative concerning a 'forum rate,'" and that "[t]he rates negotiated for two small firms representing many vaccine claimants provide some measure of what the market rate may be," the negotiated rates "are certainly not dispositive." *Id.* (footnote omitted); *see also id.* (explaining that the similar negotiated rates for the two small firms from Vienna,

Virginia, and Boston, Massachusetts that handle Vaccine Act litigation provided "some measure" of "what a willing buyer would pay a willing seller" and "clearly [did] not represent a geographic or 'hometown' rate"). Nevertheless, she found:

Although Mr. McHugh has somewhat less experience in Vaccine Act litigation than the lead counsel at each of these two firms, each of those counsel and Mr. McHugh have been practicing law for similar (and lengthy) periods of time. Thus, applying the *Blum* requirement that fees should be based on those that are paid to "lawyers of reasonably comparable skill, experience, and reputation," I have considered these negotiated rates to have *some* relevance to my determination of the forum rate for an attorney of Mr. McHugh's skill and experience.

*Id.* at *15 (citation omitted).

Ultimately, the special master reached the following conclusion:

Based on all the evidence available to me, and considering my own experience with attorney fees in the Vaccine Program, I conclude that the "forum rate" for an attorney with more than 20 years of experience, and one with considerable specialized expertise in Vaccine Act cases or litigation of similar or greater complexity, is in the range of $275–360.00 per hour, with work performed in earlier years at the lower end of this range and work performed more recently at the higher end of this range.

*Id.* Moreover, because the forum rate was not significantly more than the billing rates typically charged by Mr. McHugh and Mr. Gaynor (indeed, they were less than the attorneys' billing rates), the special master found the exception to the forum rule articulated by the Federal Circuit in *Avera* inapplicable. *Id.* at *15–16; *cf. id.* at *16–19 (concluding that "[i]f there is a 'higher cost' exception to *Avera* ..., this case does not present the prerequisites for applying it," noting that neither Mr. McHugh nor Mr. Gaynor possessed special expertise or that local attorneys were unwilling to take this case).

Accordingly, as noted above, the special master awarded petitioner the following hourly rates for Mr. McHugh's services: $310 for 2006, $320 for 2007, $330 for 2008, and $335 for 2009. *Id.* at *23. She then awarded petitioner the following hourly rates for Mr. Gaynor's services: $270 for 2008 and $275 for 2009. *Id.* at *24.

### 3. Analysis of Petitioner's Arguments

■ Petitioner generally contends that the special master erred in setting the prevailing market rate for Vaccine Act attorneys. As an initial matter, and as petitioner concedes, the special master rightly concluded that *Avera* generally requires attorneys' fees under the Vaccine Act to be awarded using the forum rate, *i.e.*, the rate prevailing in the District of Columbia " 'for similar services by lawyers of reasonably comparable skill, experience, and reputation.' " *See id.* at *2–4 (quoting *Blum*, 465 U.S. at 895 n. 11, 104 S.Ct. 1541). Petitioner bears the burden of establishing that his "requested rates are in line with" the prevailing market rate. *Blum*, 465 U.S. at 895 n. 11, 104 S.Ct. 1541. Thus, petitioner submitted the following evidence of the forum rate: a nationwide survey of law firm billing rates that included rates for Washington, DC firms; the *Laffey* matrix; and the adjusted *Laffey* matrix. The special master found this evidence insufficient to demonstrate the prevailing hourly rate for attorneys who provide services similar to those provided by Vaccine Act attorneys. Accordingly, she also looked to other evidence to determine the relevant forum rate. Petitioner asserts that the special master's determination of the forum rate was in error for several reasons. The court discusses each of petitioner's arguments below.

### a. The Special Master's Rejection of the *Laffey* Matrix Was Not Error

Petitioner's primary objection to the special master's decision is to her rejection of the *Laffey* matrix and the adjusted *Laffey* matrix as prima facie evidence of the forum rate for Vaccine Act litigation. He first argues that the matrices have been accepted as sufficient evidence of the prevailing market rate for federal litigation in the District of Columbia. He claims next that the special master improperly distinguished the litigation to which the matrices have been applied from Vaccine Act litigation. Third, petitioner contends that the special master incorrectly distinguished the Vaccine Act from other fee-shifting statutes. Finally, he argues that there are strong policy rationales for the use of the matrices. The court is not persuaded by any of petitioner's contentions.

#### i. Courts' Acceptance of the *Laffey* Matrix

It is unquestioned that the D.C. Circuit has approved of the use of the *Laffey* matrix and the adjusted *Laffey* matrix as the starting point for determining the forum rate. *See Covington*, 57 F.3d at 1108–09. Moreover, both matrices have been used by the D.C. District Court. *See DL*, 256 F.R.D. at 242–43; *Salazar*, 123 F.Supp.2d at 13–15; *Blackman*, 59 F.Supp.2d at 43. However, petitioner makes no attempt to explain why acceptance by courts in another circuit necessitates the special master's acceptance of the matrices in this case. Indeed, these decisions are not binding on the Court of Federal Claims. *See Admiral Fin. Corp. v. United States*, 378 F.3d 1336, 1340 (Fed.Cir.2004) (indicating that decisions of other federal appellate courts, while "accorded great weight," are not binding on the Federal Circuit); *AINS, Inc. v. United States*, 365 F.3d 1333, 1336 n. 1 (Fed.Cir.2004) (noting that the holdings of federal district courts "are instructive but not precedential"); *Bankers Trust N.Y. Corp. v. United States*, 225 F.3d 1368, 1371 (Fed.Cir.2000) (asserting that the decisions of federal appellate courts other than the Federal Circuit are not binding on the Court of Federal Claims). And, there is no binding precedent requiring the use of the *Laffey* matrix in Vaccine Act cases, *cf. Avera*, 515 F.3d at 1350 ("We thus have no occasion to determine whether the so-called *Laffey* matrix should play any role in the determination of fees under the Vaccine Act ...."), much less in any other type of case that arises within the Federal Circuit.[12]

12. In a nonbinding decision awarding attorneys' fees in a *Winstar*-related case, the Court of Federal Claims did use the *Laffey* matrix, proclaiming it to be "a reasonable guide to the prevailing market rates for lawyers prosecuting complex

Moreover, as petitioner concedes, neither the D.C. Circuit nor the D.C. District Court mandates the use of either matrix. The controlling standard in the D.C. Circuit for determining a reasonable hourly rate is "that an attorney's usual billing rate is presumptively the reasonable rate, provided that this rate is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Kattan, by Thomas v. District of Columbia,* 995 F.2d 274, 278 (D.C.Cir. 1993) (quoting *Blum,* 465 U.S. at 895 n. 11, 104 S.Ct. 1541). In light of this standard, some judges on the D.C. District Court have specifically rejected the use of the matrices. For example, in *Agapito,* the D.C. District Court declined to award attorneys' fees based on the *Laffey* matrix for the attorneys' participation in straightforward administrative proceedings under the IDEIA. 525 F.Supp.2d at 152–55; *accord A.C., by Clark v. District of Columbia,* No. 06–00439(HHK), 2009 WL 4840939, at *5 (D.D.C. Dec. 15, 2009) (holding that the *Laffey* matrix "is inapplicable because it is intended to apply to complex federal litigation and almost all of the attorney's fees in question are the result of counsel's preparation for attendance at routine administrative hearings"). The court distinguished the administrative proceedings from the more complex litigation to which the *Laffey* matrix applied:

> There are nine administrative proceedings for which fees are being sought. Only four involved a presentation to a hearing officer, as the parties reached settlement agreements on the others. Preparation for a due process hearing requires (1) the filing of a hearing request form; (2) participation in a resolution/mediation session prior to the hearing; (3) submission of all documents and witnesses to be introduced at the hearing; and (4) representation of the student and parent at the hearing itself, which involves putting on witnesses, cross-examining witnesses, and introducing evidence. Legal argument may also be made. While an IDEIA case may be more complicated, ... these particular matters

federal litigation in the District of Columbia...." *First Fed. Sav. & Loan Ass'n of Rochester v.*

were not. There were no pre-hearing interrogatories or discovery, no production of documents or depositions, no psychiatrists or psychologists testifying about learning disabilities, no briefings of intricate statutory or constitutional issues, no pre-trial briefings, no lengthy hearings, no protracted arguments, and few, if any, motions filed.

*Agapito,* 525 F.Supp.2d at 152 (citations omitted). Similarly, in *Muldrow,* the D.C. District Court reduced the plaintiff's fee request—based on the *Laffey* matrix—by twenty-five percent because the case was a "relatively straightforward negligence suit," explaining:

> [T]he case involved a single plaintiff and a single defendant; there were few pre-trial motions; the case was not vigorously litigated by defendant; and plaintiff's attorneys had already thoroughly investigated defendant in a prior case that raised similar issues. These factors all distinguish this lawsuit from the type of case in which *Laffey* fees are typically awarded.

*Muldrow,* 397 F.Supp.2d at 4 (footnote omitted). Thus, the mere acceptance of the *Laffey* matrix by some judges in certain cases in the D.C. District Court does not mandate its use by this court or the special master.

### ii. Distinguishing Vaccine Act Litigation From Complex Federal Litigation

The decisions of the D.C. District Court in *Agapito* and *Muldrow* are also instructive in the court's consideration of petitioner's second contention—that there is no relevant distinction between Vaccine Act litigation and the litigation to which the *Laffey* matrix and adjusted *Laffey* matrix have been applied. Those fee decisions reflect that certain types of federal litigation are not sufficiently complex to warrant an award of attorneys' fees based on either matrix. Here, petitioner argues that, contrary to the special master's finding, Vaccine Act litigation is sufficiently complex.

*United States,* 88 Fed.Cl. 572, 586 (2009).

As noted above, in *Laffey*, the D.C. District Court approved a schedule of "the prevailing rates in the community for lawyers of comparable skill, expertise and reputation in complex federal litigation" for use in a Title VII employment discrimination case. 572 F.Supp. at 371–75. The court remarked on the complexity of the lawsuit, noting that it was "an extraordinary undertaking in many respects, consuming thirteen years and thousands of personnel hours and raising numerous issues under both [federal employment discrimination] statutes." *Id.* at 359. In particular:

> The case was contemplated as a class action on behalf of over 3,300 flight attendants; the alleged statutory violations touched virtually every aspect of Defendant's employment practices and raised a multitude of legal and factual issues; and the outcome of these issues was far from preordained. No prior government or private proceeding had suggested Defendant's liability or had even developed the facts of the case; Plaintiffs' counsel had to conduct their own extensive investigation and discovery, and they simply could not know at the outset of their representation how the critical facts would develop.

> Moreover, the case was brought at an early stage in the development of the law under Title VII and the Equal Pay Act. There were few significant legal precedents interpreting either of the statutes and none from the United States Supreme Court. Thus, Plaintiffs' counsel could not know or reliably predict what the controlling standards would be.

> Finally, Plaintiffs knew they were facing a large, well-financed corporate defendant with a policy and history of tenaciously defending cases brought against it. This fact, combined with the unsettled state of the law, presaged a protracted battle in both the trial and appellate courts. And Plaintiffs' counsel knew at the outset that the battle would be waged on Defendant's behalf by extremely capable counsel. Thus, Plaintiffs' counsel knew from the beginning that they would be met with a maximum legal effort both in terms of the quality of defense counsel and the vigor with which Defendant would litigate the action, and that nothing less than the same effort would be required of them.

*Id.* at 378–79 (citation & footnotes omitted).

To demonstrate that Vaccine Act litigation is similarly complex, petitioner quotes language from three Vaccine Act decisions. Petitioner first represents—incorrectly—that the Claims Court expressed the following view of the complexity of Vaccine Act litigation:

> Although Congress chose to provide petitioners with an alternative to the traditional civil forum, relax standards of causation, and ease rigid procedural rules, issues under the Act are nonetheless complex. Vaccine litigation requires counsel's extensive knowledge of biology, microbiology, immunology, neurology, pediatrics and infant and child development, and a variety of complex damage issues. It does not follow that simply because the legal issues have changed, and perhaps been simplified, that significant skill is not required to competently represent a petitioner. The substantive issues of vaccine litigation remain complex, both factually and legally-it is merely the procedural framework which has simplified.

*Monteverdi v. Sec'y of HHS*, 19 Cl.Ct. 409, 434 (1990) (Spec. Mstr. Report & Recommendation) (footnotes omitted). However, it was the special master, not the Claims Court, who crafted the quoted language.[13] This court's noting petitioner's misattribution is not mere nit-picking. The quotation is found in a portion of the special master's Report and Recommendation that was not adopted

---

13. Petitioner is not alone in attributing the language in *Monteverdi* concerning the complexity of Vaccine Act litigation to the Claims Court rather than the special master; other petitioners, and even two special masters, have also done so. *See Rupert, by Rupert v. Sec'y of HHS*, 55 Fed.Cl. 293, 299 (2003) (noting that petitioner cited *Monteverdi* for the proposition that Vaccine Act litigation was complex); *Walmsley*, 2009 WL 4064105, at *7 n. 13 (attributing the quotation to the Claims Court); *Erickson v. Sec'y of HHS*, No. 96–361V, 1999 WL 1268149, at *4 n. 8 (Fed.Cl. Spec.Mstr. Dec. 10, 1999) (same).

by the Claims Court.[14] *See id.* at 413 ("[W]e incorporate herein by reference and adopt the attached Report of the Special Master *only* with respect to the factual findings and conclusion of law on the merits regarding entitlement to the death benefit."). Indeed, the Claims Court specifically rejected "the Special Master's findings regarding reasonable hourly fee rates," which included the finding concerning the complexity of Vaccine Act litigation. *Id.* at 420. Significantly, the Claims Court made express findings to the contrary:

> [N]o creditable showing was made through *any* of the affiants—establishing unusual facts showing that extraordinary talents were required and that such services were actually provided in litigating this case which would warrant the high fees claimed. Rather, the irrefutable evidence requires a finding to the contrary. This conclusion is patently clear for the reason that—(i) to establish the requisite liability under the Program a reduced/minimum standard of proof is required; (ii) under the Program there is no necessity to prove negligence in the traditional manner in tort cases; (iii) proof problems were minuscule if not nonexistent in this case; (iv) the case is neither complex nor vexing in fact or in law in that the hearing transcript consisted of only 96 pages; thus, the time required for the hearing was probably less than three hours; (v) there was no briefing of the issues; (vi) the trial proceedings were non-adversarial in that the respondent's counsel withdrew and did not cross-examine any witnesses or adduce any evidence, except the autopsy report; and (vii) upon the perfunctory establishment of certain basic

facts, there is a rebuttable presumption of causation and resulting liability under the Program.

*Id.* at 419–20 (footnote omitted). Therefore, the court finds the quotation supplied by petitioner to be unavailing. Because the quoted language was rejected by the reviewing court, it lacks any authoritative or probative value. Thus, petitioner cannot rely on that language and the court strongly cautions against the future use of the quotation.

The second quotation highlighted by petitioner and offered in support of his position comes from an attorneys' fees decision issued by the Chief Special Master:

> While the rules of procedure are relaxed, complex legal and medical issues are encountered with relative frequency and many claims require as much preparation as traditional tort actions. Clearly, the straightforward nature of the Act, as originally contemplated by Congress, has proven a falsity in many instances. Not only do most claims take years to resolve, but the amount of damages awarded may reach in the millions over a vaccine's lifetime. These scenarios are quite comparable with the traditional tort system. In addition, because of the 1995 administrative changes to the Vaccine Injury Table, most petitioners are forced to pursue actual causation theories. Consequently, when the medical records fail to sufficiently support petitioners' contentions, as they often do, petitioners are obligated to present testimony from qualified medical experts who may have spent hours reviewing the records and preparing one or several expert

---

**14.** As originally enacted, the Vaccine Act allowed special masters to propose findings of facts and conclusions of law, and "[u]pon objection by the petitioner or respondent to the proposed findings of facts or conclusions of law prepared by the special master or upon the court's own motion," the Claims Court was required to "undertake a review of the record" and could then, if warranted, "make a de novo determination of any matter and issue its judgment accordingly...." Pub.L. No. 99–660, § 311(a), 100 Stat. 3743, 3762 (codified as amended at 42 U.S.C. § 300aa–12(d)(3)(A), –12(e)). In 1989, Congress amended the Vaccine Act to require special masters to issue decisions and to change the Claims Court's standard of review to one that was more deferen-

tial. *See* Omnibus Budget Reconciliation Act of 1989, Pub.L. No. 101–239, § 6601(g)-(h), 103 Stat. 2106, 2288–90 (codified at 42 U.S.C. § 300aa–12(d)(3)(A), –12(e)). In *Monteverdi,* the petition was pending and the evidentiary record was closed prior to the effective date of the amendment to the Vaccine Act–December 19, 1989. *See Monteverdi,* 19 Cl.Ct. at 411 (noting that the special master issued his Report and Recommendation on December 5, 1989). As a result, the Claims Court was required "to proceed ... in accordance with the law in effect before the date of the enactment" of the amendment. Omnibus Budget Reconciliation Act of 1989, § 6601(s)(1)(B), 103 Stat. at 2293.

reports. Furthermore, it is this court's experience that one expert is often inadequate to support petitioners' claims; it is not unusual for one to four experts from various disciplines within the medical community to testify on petitioners' behalf. In addition, multiple hearings in any given case are not infrequent. And, of course, the court relies heavily on the experts' testimony to comprehend what are often truly difficult medical matters in causation-in-fact cases. The effective presentation of these cases requires knowledgeable, able, and experienced counsel. Such counsel command high hourly rates in the open market; the same market the lodestar is premised upon. Therefore, the argument that Program litigation is uncomplicated and requires less expertise or preparation than traditional tort litigation is no longer valid and will not be considered a factor in determining hourly rates.

*Erickson*, 1999 WL 1268149, at *4. The Chief Special Master accurately described some of the complexities that may arise in Vaccine Act litigation. However, he did not address whether Vaccine Act litigation is as complex as the litigation to which the *Laffey* matrix has been applied. Indeed, in a subsequent decision, which petitioner did not distinguish, much less cite, the Chief Special Master found that the petitioner had not produced any "evidence that the hourly rates in the *Laffey* Matrix represent [ ] the rates for comparable attorneys handling comparable cases to those handled in the Vaccine Program." *Ray, by Ray v. Sec'y of HHS*, No. 04–184V, 2006 WL 1006587, at *5 (Fed.Cl.Spec.Mstr. Mar. 30, 2006); *accord English ex rel. English v. Sec'y of HHS*, No. 01–6IV, 2006 WL 3419805, at *7 (Fed.Cl.Spec.Mstr. Nov. 9, 2006) (noting that despite his suggestion in *Ray* that a petitioner would need to submit evidence supporting the application of the *Laffey* matrix in Vaccine Act litigation, the petitioners had not submitted any "new evidence that establishes that the *Laffey* Matrix has applicability beyond those fee-shifting" statutes with prevailing party requirements to which it had already been applied).

The final quotation supplied by petitioner is from another decision issued by the special master assigned to this case: "Certain provisions of the Vaccine Act and its legislative history strongly indicate that Congress contemplated that the special masters would develop expertise in the complex medical and scientific issues involved in actual causation claims and would then apply this expertise to the resolution of other cases." *Snyder, by & Through Snyder v. Sec'y of HHS*, No. 01–162V, 2009 WL 332044, at *2 (Fed.Cl. Spec.Mstr. Feb. 12, 2009), *aff'd*, 88 Fed.Cl. 706 (2009). In *Snyder*, the special master merely recited the congressional purpose behind designating a group of specialized decision-makers to preside over Vaccine Act cases, and did not make any broader statements about whether Vaccine Act litigation, as a whole, was complex. However, she did make the broader statement in this case, concluding that Vaccine Act litigation is not sufficiently complex to justify using the *Laffey* matrix or the adjusted *Laffey* matrix as prima facie evidence of the forum rate. Accordingly, the special master's finding in this case seriously undercuts petitioner's reliance on the special master's statement in *Snyder*.

By offering quotations from *Erickson* and *Snyder* regarding the complexity of Vaccine Act cases without acknowledging the later decisions by those same special masters that declined to find, either expressly or impliedly, that Vaccine Act litigation is of sufficient complexity to warrant the application of the *Laffey* matrix as prima facie evidence of the forum rate, petitioner misrepresents the import of the quotations and seriously detracts from his argument. Indeed, while the language quoted by petitioner describes certain aspects of Vaccine Act litigation as complex, none of the commentary addresses whether Vaccine Act litigation is of sufficient complexity to warrant comparison to the complex federal litigation described in *Laffey* and other cases within the D.C. Circuit. Therefore, the special master's determination in this case that Vaccine Act litigation is not comparably complex does not contradict the views expressed in *Erickson* and *Snyder*.[15]

---

15. Subsequent to the special master's decision on attorneys' fees and costs in this case, another

special master concluded that Vaccine Act litiga-

Moreover, the court cannot say, as a matter of law, that all Vaccine Act litigation qualifies as complex federal litigation such that the *Laffey* matrix should constitute prima facie evidence of the forum rate. The elements contributing to the complexity of the *Laffey* litigation included: (1) its posture as a class action on behalf of over 3,300 plaintiffs; (2) the implication of almost all of the defendant's employment practices; (3) the large number of factual and legal issues; (4) the need for the plaintiffs to conduct an extensive investigation and discovery; (5) the lack of significant binding precedent defining the controlling legal standards; (6) the presence of a well-financed corporate defendant; and (7) the protracted length of the litigation. *Laffey*, 572 F.Supp. at 359, 378–79. Such taxing demands are almost never present in Vaccine Act litigation. For example, there is no provision for class actions in either the Vaccine Act or the Vaccine Rules. Discovery is not generally permitted. *See* 42 U.S.C. § 300aa–12(d)(2)(E); Vaccine Rule 7. The controlling legal standards have been well fleshed out. *See, e.g., Althen v. Sec'y of HHS*, 418 F.3d 1274, 1278 (Fed.Cir.2005) (summarizing Federal Circuit precedent dating from 1992 to describe a three-part test for causation-in-fact). And, the length of the litigation is statutorily restricted. *See, e.g.,* 42 U.S.C. § 300aa–12(d)(3)(A)(ii) (requiring a special master to issue a decision within 240 days, exclusive of any period in which proceedings are suspended), –12(d)(3)(C) (allowing suspensions of proceedings of up to 150 days), –12(e)(2) (requiring the Court of Federal Claims to rule on a motion for review within 120 days of receiving respondent's response and permitting no more than ninety days for remand to the special master). Indeed, upon the expiration of the statutory deadline, petitioners can choose to withdraw their petition under the Vaccine Act and bring a civil action in the appropriate court. *See id.* §§ 300aa–12(g), –16(c), –21(b). Thus, any decision to continue Vaccine Act litigation beyond the statutory time limitation is entirely voluntary. Altogether, these differences demonstrate that litigation under the Vaccine Act is more streamlined and straightforward than the litigation that occurs under other statutes with fee-shifting provisions, as the special master observed.[16] *See Rodriguez*, 2009 WL 2568468, at *11 (citing *Avera*, 515 F.3d at 1353 (Rader, J., concurring)).

Equating Vaccine Act litigation to traditional tort litigation is similarly unavailing. The court does not dispute the proposition that Vaccine Act litigation can be "quite comparable with the traditional tort system...." *Erickson*, 1999 WL 1268149, at *4. However, that does not force the conclusion that it is the type of complex federal litigation to which the *Laffey* matrix applies. Not all tort litigation is sufficiently complex. *See Muldrow*, 397 F.Supp.2d at 4 (declining to apply the *Laffey* matrix to a "relatively straightforward negligence suit").

Furthermore, while the court recognizes that the D.C. District Court has used the *Laffey* matrix in awarding attorneys' fees under a wide range of fee-shifting statutes, *see Miller v. Holzmann*, 575 F.Supp.2d 2, 14 (D.D.C.2008) (listing cases), the decisions memorializing the awards do not compel this court to apply the *Laffey* matrix when awarding attorneys' fees under the Vaccine Act. For one, the Court of Federal Claims is not bound by the D.C. District Court's decisions memorializing its awards. *AINS, Inc.*, 365 F.3d at 1336 n. 1. And, none of the D.C. District Court's decisions bears the imprimatur of the D.C. Circuit, which would lend them more persuasive value. Indeed, although the D.C. Circuit has endorsed the use of the *Laffey* matrix in determining a reasonable award of attorneys' fees, *Covington*, 57 F.3d at 1109, it "has never held that *Laffey* rates are the only rates that a court may consider reasonable," *Miller*, 575 F.Supp.2d at 16. Accordingly, the court finds no error in the special master's conclusion that Vac-

tion constituted complex federal litigation. *See Walmsley*, 2009 WL 4064105, at *12.

**16.** In addition, it bears noting that not all Vaccine Act cases are alike. Cases encompassing Table injuries are typically less complicated than those where causation-in-fact must be proven. And, causation-in-fact cases themselves have differing levels of complexity. Thus, it would be a mistake to characterize all Vaccine Act litigation as equally complex.

cine Act litigation does not constitute complex federal litigation as contemplated in *Laffey*.

### iii. Distinguishing the Vaccine Act From Other Fee–Shifting Statutes

Similarly, the special master's finding that the Vaccine Act's lack of a prevailing party requirement further distinguished it from other fee-shifting statutes is not error. In concluding that the Vaccine Act differs from the fee-shifting statutes under which the *Laffey* matrix has been used in calculating attorneys' fees, the special master remarked:

> In the fee-shifting cases in which the *Laffey* Matrix is applied, a party must prevail in the litigation in order to receive fees, a factor that suggests not only that the underlying claim was meritorious, but also that the case was competently tried. Under the Vaccine Act, nearly all litigants receive attorney fees and costs because the Act provides that fees may be awarded to unsuccessful litigants.... Thus, the risk of attorneys receiving no compensation at all is significantly reduced, a factor that undoubtedly influences whether an attorney will take a Vaccine Act case in which the likelihood of prevailing is not high.

*Rodriguez*, 2009 WL 2568468, at * 10–11. Petitioner interprets the special master's language as a conclusion that "the *Laffey* Matrix has no application to Vaccine Act cases because *Laffey* rates are higher due to contingent risk...." Mot. 20. Yet, nowhere does the special master comment that the risk of losing a case is reflected in the *Laffey* matrix's hourly rates. Indeed, such a finding would likely be in error. *See Masias v. Sec'y of HHS*, No. 99–697V, 2009 WL 1838979, at *19 (Fed. Cl. Spec. Mstr. June 12, 2009) ("Because the original *Laffey* matrix rates seem to correspond to, if not actually derive from, the rates paid to defense counsel, it appears that the original *Laffey* matrix rates did not have a contingency or risk factor built into them. Successive updates of the *Laffey* matrix have not injected a contingency factor into the matrix."), *aff'd,* slip op. at 2 (Fed.Cl. Dec. 10, 2009) (unpublished decision). Moreover, if the *Laffey* matrix did account for risk of loss, its validity would be

called into question by the very same case law cited by petitioner in support of his argument. *See City of Burlington v. Dague*, 505 U.S. 557, 567, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) ("[W]e hold that enhancement for contingency is not permitted under the fee-shifting statutes at issue."); *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 727, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (plurality opinion) ("[W]e conclude that multipliers or other enhancement of a reasonable lodestar fee to compensate for assuming the risk of loss is impermissible under the usual fee-shifting statutes."); *Welch v. Metro. Life Ins. Co.,* 480 F.3d 942, 947 (9th Cir.2007) ("The district court correctly observed that contingency cannot be used to justify a fee enhancement or an inflated hourly rate." (citations omitted)); *Davis v. City & County of San Francisco,* 976 F.2d 1536, 1548–49 (9th Cir.1992) ("While the *Dague* Court did not speak directly to this point, we believe that its rejection of contingency as a basis for multiplying a lodestar fee similarly dictates that contingency not be a factor in the setting of billing rates."), *vacated in part on other grounds,* 984 F.2d 345 (9th Cir.1993).

Notably, the special master's acknowledgment of the Vaccine Act's lack of a prevailing party requirement was of a limited nature; she only cited the lack of such a requirement as one reason why the *Laffey* matrix did not constitute prima facie evidence of the forum rate under the Vaccine Act. Any broader interpretation of her comments *e.g.,* that the special master reduced her award of attorneys' fees to petitioner based on the Vaccine Act's lack of a prevailing party requirement- would be in error. Thus, the court cannot conclude that the special master's brief discussion of the Vaccine Act's lack of a prevailing party requirement is contrary to law.

### iv. Policy Considerations

Finally, petitioner advances three general policy arguments in support of the adoption of the *Laffey* matrix as prima facie evidence of the forum rate. First, he contends that the matrix has been used in the forum district for more than twenty-five years, making it a "time-tested tool for courts." Mot. 26. Of course, the only court in the forum that

has used the *Laffey* matrix on a regular basis is the D.C. District Court.[17] Thus, while it may be a well-understood and oft-used tool in the D.C. District Court, it does not enjoy the same history in this court.

Second, petitioner makes the related contention that litigation of attorneys' fees would be more efficient if the *Laffey* matrix was used to calculate the forum rate in Vaccine Act cases, avoiding the "second major litigation" decried by the United States Supreme Court ("Supreme Court") in *Hensley*, 461 U.S. at 437, 103 S.Ct. 1933. Efficiency is certainly a laudable goal. However, if the *Laffey* matrix does not accurately represent the forum rate applicable in Vaccine Act cases, the efficiency engendered by its use is irrelevant.

Finally, petitioner asserts that the use of the *Laffey* matrix would further one of the underlying purposes of the Vaccine Act: the need for petitioners to have access to a competent bar to advocate on their behalf. *See Avera*, 515 F.3d at 1352 ("[O]ne of the underlying purposes of the Vaccine Act was to ensure that vaccine injury claimants have readily available a competent bar to prosecute their claims."); *Saunders*, 25 F.3d at 1035 ("A secondary purpose of the Act is to ensure that vaccine-injury claimants will have readily available a competent bar to prosecute their claims under the Act."); *see also Augustine v. Dep't of Veterans Affairs*, 429 F.3d 1334, 1343 (Fed.Cir.2005) ("The Supreme Court has, on numerous occasions, explained that the 'fundamental aim of [fee-shifting] statutes is to make it possible for those who cannot pay a lawyer for his time and effort to obtain competent counsel, this by providing lawyers with reasonable fees to be paid by the losing defendants.'" (quoting *Del. Valley Citizens' Council for Clean Air*, 483 U.S. at 725, 107 S.Ct. 3078 (plurality opinion))). As the special master noted, however, petitioner offered no persuasive evidence, and she was not aware of any evidence, that potential claimants were having

any difficulty securing competent counsel with the hourly rates currently awarded under the Vaccine Act:

> The record is likewise sparse concerning the unavailability of other counsel to take this case. . . .

> The evidence that Mrs. Rodriguez had difficulty in locating an attorney willing to take her son's case fails to establish that no attorney practicing in the Vaccine Program, at the rates customarily paid by this Program, would take the case. There are many reasons a law firm may decline a case, and the facts of this one likely contributed to the reluctance of the firms contacted to do so. . . .

> The fact that some attorneys or firms have ceased to handle Vaccine Act cases does not, standing alone, constitute sufficient evidence that the hourly rates paid to attorneys in Vaccine Act cases are inadequate. Cases under the Vaccine Act continue to be filed, both by attorneys and by *pro se* litigants. The number of *pro se* litigants remains small. Some litigants who initially file *pro se* petitions subsequently secure counsel. Some litigants who are represented by counsel have a parting of the ways with their attorneys and subsequently proceed *pro se*.

> Petitioner's anecdotal evidence of attorneys leaving the Vaccine Program may correctly reflect that specific counsel have elected to practice elsewhere. However, reasoning from the specific to the general often results in a fallacious argument. Petitioner has provided no evidence of a general exodus of attorneys from the Vaccine Program. Data available from the Clerk of Court is to the contrary. Of the attorneys who had three or more vaccine cases filed in 1997 or 1998, all but one of those attorneys also filed cases in 2007 or 2008. In addition, eight more attorneys joined the list of those filing three or more cases in 2007 or 2008.

---

17. The Federal Circuit has not discussed the use of the *Laffey* matrix outside of the Vaccine Act context. The Court of Federal Claims has mentioned the *Laffey* matrix outside of the Vaccine Act context in only two published decisions. *See First Fed. Sav. & Loan Ass'n of Rochester*, 88

Fed.Cl. at 586 (using the *Laffey* matrix in a *Winstar*-related case); *Filtration Dev. Co. v. United States*, 63 Fed.Cl. 612, 623–24 & n. 19 (2005) (finding it unnecessary to address plaintiff's *Laffey* matrix arguments).

*Rodriguez,* 2009 WL 2568468, at *17; *see also id.* at *12 ("If a reasonable fee is that fee necessary to attract and retain competent counsel, then the fees that have been awarded in Vaccine Act cases in recent years have adequately accomplished that purpose."), 18 ("The 'conclusory impressions of interested lawyers' does not demonstrate that Vaccine Act litigants are unable to retain qualified counsel, much less that the rates of pay authorized by this court are the cause of any such inability to find representation." (quoting *U.S. Dep't of Labor v. Triplett,* 494 U.S. 715, 726, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990))). Moreover, Congress's decision to permit an award of attorneys' fees to nonprevailing petitioners is another inducement to the private bar to represent petitioners in Vaccine Act cases. *See Saunders,* 25 F.3d at 1035–36 (noting that one of the purposes of the Vaccine Act, ensuring "that vaccine-injury claimants will have readily available a competent bar to prosecute their claims," is "effectuated by permitting the award of attorneys' fees and costs both to prevailing and non-prevailing claimants"); H.R.Rep. No. 99–908, at 22 (1986), U.S.Code Cong. & Admin.News 1986, pp. 6344, 6363 ("[T]he Committee does not intend that the limitation of fees to those included in the award act to limit petitioners' ability to obtain qualified assistance and intends that the court make adequate provision for attorneys' time and that the court exercise its discretion to award fees in non-prevailing, good-faith claims."). Thus, there is adequate support for the conclusion that awards of attorneys' fees calculated without the benefit of the *Laffey* matrix have been sufficient to attract competent counsel to Vaccine Act litigation. Altogether, none of the policy considerations advanced by petitioner convinces the court to overturn the special master's rejection of the *Laffey* matrix as prima facie evidence of the forum rate.

### v. Conclusion

In sum, the court concludes that petitioner's objections to the special master's rejection of the *Laffey* matrix and the adjusted *Laffey* matrix as prima facie evidence of the forum rate for Vaccine Act cases lack merit. The special master's decision in this respect

was not arbitrary, capricious, an abuse of discretion, or contrary to law.

### b. The Special Master's Consideration of Evidence Predating *Avera* Was Not Error

█ Petitioner next contends that the special master ignored the evidence he offered and instead relied almost entirely upon evidence that concerned hourly rates awarded prior to the Federal Circuit's decision in *Avera.* Implicit in petitioner's argument are two contentions; first, that the special master improperly weighed the evidence before her regarding the forum rate and second, that the special master should not have considered any evidence concerning hourly rates awarded before the Federal Circuit issued its decision in *Avera.* Petitioner's first contention founders under the weight of the Federal Circuit's unmistakable declaration that special masters have considerable discretion in determining an award of reasonable attorneys fees. *Saxton,* 3 F.3d at 1520; *accord Delta–X Corp.,* 984 F.2d at 414; *see also Cybor Corp.,* 138 F.3d at 1460 (defining an abuse of discretion). The special master was entitled to weigh the evidence concerning the forum rate as she saw fit. *See Lampe,* 219 F.3d at 1360 ("The arbitrary and capricious standard of review is difficult for an appellant to satisfy ... with respect to an issue that turns on the weighing of evidence by the trier of fact."); *Whitecotton,* 81 F.3d at 1108 ("Congress desired the special masters to have very wide discretion with respect to ... the weight to be assigned that evidence."); *Hines,* 940 F.2d at 1527 (noting that "arguments as to the weighing of evidence ... do not demonstrate reversible error").

█ With respect to the second contention, petitioner does not specify how the special master's use of this "pre-*Avera*" evidence to ascertain the forum rate was in error. Evidence of hourly rates is not rendered useless merely because the evidence predates the Federal Circuit's decision in *Avera.* Indeed, some of the evidence considered by the special master—the hourly rate suggested in *Flannery* and the hourly rate negotiated on behalf of Professor Meyers—is directly relevant to the forum rate as it concerns Vaccine Act attorneys who practice in the District of

Columbia. Further, the special master expressly noted that she approached the use of other awarded hourly rates with caution due to the fact that they were awarded before the Federal Circuit endorsed the forum rule. Finally, the special master explained that the similar rates negotiated by the two small firms from Vienna, Virginia, and Boston, Massachusetts that handle Vaccine Act litigation were evidence of what a willing buyer might pay a willing provider of Vaccine Act litigation services and thus did not constitute the geographic rates rejected by the Federal Circuit in *Avera*. Accordingly, the court finds no error in the special master's consideration of "pre-*Avera*" attorneys' fees awards. The special master provided sufficient findings and analysis to demonstrate that she "considered the relevant evidence of record, dr[ew] plausible inferences and articulated a rational basis for the decision...." *Hines*, 940 F.2d at 1528.

### c. The Special Master's Purported Limiting of the Relevant Forum Was Not Error

 Next, petitioner contends that the special master's definition of the relevant forum was too narrow. Specifically, he avers that the special master improperly limited the market for "similar services," *Blum*, 465 U.S. at 895 n. 11, 104 S.Ct. 1541, solely to prior Vaccine Act litigation. Petitioner asserts that this so-called "micro-market" approach has been soundly rejected by several of the United States Courts of Appeals. There are two difficulties with petitioner's argument. First, in reading the cases he cited in support of his contention, it is apparent that not all of the United States Courts of Appeals have rejected the "micro-market" approach. *Compare Christensen v. Stevedoring Servs. of Am.*, 557 F.3d 1049, 1054–55 (9th Cir.2009) (finding the petitioners' contention that the Benefits Review Board "should not be allowed to define 'prevailing market rate' in such a way as to define the 'market' only in terms of what has been awarded" in prior cases under the same fee shifting statute a "legitimate point" but also concluding that it would be reasonable for the Benefits Review Board to look at prior awards if a fee applicant failed to "produce

evidence of the relevant market and the rate charged"), *and Student Pub. Interest Research Group of N.J., Inc. v. AT & T Bell Labs.*, 842 F.2d 1436, 1445–46 (3d Cir.1988) (rejecting the "micro-market" approach), *with Newport News Shipbuilding & Dry Dock Co. v. Brown*, 376 F.3d 245, 251 (4th Cir.2004) ("Evidence of fee awards in comparable cases is generally sufficient to establish the prevailing market rates in the relevant community." (internal quotation marks omitted)), *and Student Pub. Interest Research Group of N.J., Inc.*, 842 F.2d at 1445–46 (citing cases in which the United States Courts of Appeals for the Seventh and Eleventh Circuits used a "micro-market" approach that defined the "market for public interest legal work" as "what public interest lawyers actually receive," "rather than looking to the rates of attorneys of comparable skill and experience"). The lack of consensus among the circuit courts leads this court to conclude that it may not be prudent to reject a "micro-market" approach out of hand. Moreover, the one federal appellate court that issues decisions binding on this court, the Federal Circuit, has not staked out a position on this issue.

Second, and more problematic, is that the special master's purported limiting of the market for services similar to Vaccine Act litigation is a direct result of petitioner's failure to provide evidence sufficient to demonstrate the prevailing market rate. Petitioner submitted, as previously noted, the following evidence of the forum rate: the *Laffey* matrix; the adjusted *Laffey* matrix; and a nationwide survey of law firm billing rates that included rates for Washington, DC firms. As the court held above, the special master's rejection of the *Laffey* matrix and the adjusted *Laffey* matrix as prima facie evidence of the forum rate for Vaccine Act cases was not error. Nor was it error for the special master to conclude that the matrices were insufficient even when considered as "some evidence" of the forum rate. *See Whitecotton*, 81 F.3d at 1108 ("Congress desired the special masters to have very wide discretion with respect to the evidence they would consider...."). Furthermore, the special master did not err in concluding that

nationwide survey of law firm billing rates lacked the details necessary to determine whether the services provided by the included law firms could be compared favorably with Vaccine Act litigation; the survey is devoid of any information about the types of litigation handled by the law firms. *See id.* Thus, in the absence of sufficient evidence from petitioner, the special master was entitled to turn to the other evidence before her, which mainly consisted of Vaccine Act-related information, as well as her prior experience handling Vaccine Act litigation, to determine the applicable prevailing market rate. The special master's decision in this respect was not arbitrary, capricious, an abuse of discretion, or contrary to law.

### d. The Special Master's Consideration of Evidence Was Not Error

■ Petitioner next argues that the evidence considered by special master—*i.e.*, Professor Meyer's negotiated hourly rates, the *Flannery* order, the hourly rates charged and received by other attorneys, the negotiated hourly rates for two small law firms in Boston, Massachusetts and Vienna, Virginia, and her experience reviewing applications for attorneys' fees under the Vaccine Act—was legally insufficient to support her determination of the forum rate for Vaccine Act litigation. Petitioner's argument is unconvincing for two reasons.

First, as noted above, the special master turned to this evidence after rejecting the limited evidence submitted by petitioner as inadequate to establish the applicable forum rate. In other words, the special master would not have needed to examine this evidence had petitioner met his burden of proof. Thus, petitioner has little basis to complain about what evidence the special master considered. As the Federal Circuit explained in *Whitecotton*, "Congress desired the special masters to have very wide discretion with respect to the evidence they would consider and the weight to be assigned that evidence." 81 F.3d at 1108. In her decision, the special master adequately explained that she considered all of the evidence before her.

Second, the Federal Circuit has been equally clear that special masters are entitled to use their "prior experience in reviewing fee applications" to determine a reasonable hourly rate. *Saxton*, 3 F.3d at 1521. Petitioner has not cited any precedent indicating that the length of a special master's tenure or the number of attorneys' fees applications upon which she has personally ruled preclude the special master from using her experience. *Cf. Sabella*, 86 Fed.Cl. at 217 ("Critical commentary on the special master's tenure as a special master does not aid petitioner's argument."). Therefore, the special master's reliance on her experience was proper.

Overall, a special master has broad discretion to determine a reasonable amount of attorneys' fees. *Saxton*, 3 F.3d at 1520. Here, the special master adequately explained the evidence contained in the record and how she chose to evaluate it. Thus, her hourly rate determination was not "based on clearly erroneous findings of fact," was not "based on erroneous interpretations of the law," and was not "clearly unreasonable, arbitrary or fanciful." *Cybor Corp.*, 138 F.3d at 1460. Accordingly, the court finds no abuse of discretion in the special master's consideration of evidence.

### e. The Special Master's Ultimate Hourly Rate Determination Was Not Error

■ Finally, petitioner contends that the special master erred by setting the hourly rates for Mr. McHugh and Mr. Gaynor below their actual billing rates. Specifically, petitioner argues that his attorneys' actual billing rates—$450 per hour for Mr. McHugh and $450–475 per hour for Mr. Gaynor—represented the prevailing market rates for their services. It is unquestioned that an attorney's billing rate may be evidence of the prevailing market rate in some situations. *See Missouri v. Jenkins, by Agyei*, 491 U.S. 274, 285, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) ("In determining how other elements of the attorney's fee are to be calculated, we have consistently looked to the marketplace as our guide to what is 'reasonable.'"); *Kattan*, 995 F.2d at 278 ("[A]n attorney's usual billing rate is presumptively the reasonable rate, provided that this rate is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" (quoting *Blum*, 465 U.S. at 895 n. 11, 104 S.Ct. 1541)).

However, the Federal Circuit's decision in *Avera* precludes such a result here.

In *Avera,* the Federal Circuit adopted the Supreme Court's definition of prevailing market rate: "the rate 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" 515 F.3d at 1348 (quoting *Blum,* 465 U.S. at 895 n. 11, 104 S.Ct. 1541). It then held that when calculating attorneys' fees under the Vaccine Act, the hourly rate to be used should be the prevailing market rate of the forum, *i.e.,* the District of Columbia, unless the attorney performed the bulk of the work outside of the forum in a legal market where the attorney's rates were "substantially lower." *Id.* at 1348–49. Thus, the Federal Circuit left no doubt that the forum rate in Vaccine Act cases is distinct from the prevailing market rate for an attorney's services in his or her home forum. The special master, following the Federal Circuit's holding in *Avera,* determined, as a threshold matter, the prevailing market rate in the District of Columbia for services akin to Vaccine Act litigation performed by attorneys with the skill, experience, and reputation comparable to Mr. McHugh and Mr. Gaynor. Because neither of petitioner's attorneys practice in the District of Columbia—Mr. McHugh practices law in New York City and Mr. Gaynor practices law in the Central District of California—their usual billing rates are irrelevant when determining the forum rate. Indeed, as the Supreme Court has remarked:

> [Fee-shifting] statutes were not designed as a form of economic relief to improve the financial lot of attorneys, *nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client.* Instead, the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws. Hence, if plaintiffs ... find it possible to engage a lawyer based on the statutory assurance that he will be paid a "reasonable fee," the purpose behind the fee-shifting statute has been satisfied.

*Pennsylvania v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (emphasis added). Accordingly, the special master's failure to award petitioner attorneys' fees based on the hourly rates usually billed by his attorneys was not legal error.

### f. Conclusion

For the foregoing reasons, the court concludes that the special master's determination of the prevailing market rate for the services provided by petitioner's attorneys was not arbitrary, capricious, an abuse of discretion, or contrary of law. It therefore overrules petitioner's first objection to the special master's decision.

## D. Objection Two: Mr. McHugh's Hours

### 1. Legal Standards

Petitioner's second objection to the special master's decision relates to the number of hours she awarded for Mr. McHugh's preparation of a posthearing memorandum. As noted above, the starting point to determining the amount of reasonable attorneys' fees is the lodestar—the product of the number of hours the attorney reasonably expended on the litigation and a reasonable hourly rate. *Avera,* 515 F.3d at 1347. When making this initial calculation, the special master "should exclude ... hours that were not reasonably expended." *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933 (internal quotation marks omitted), *quoted in Saxton,* 3 F.3d at 1521; *accord Hines,* 22 Cl.Ct. at 754 ("The special master is within his discretion in reducing hours that are duplicative, padded, spent on unrelated matters, or not reasonably expended." (internal quotation marks omitted)). In fact, special masters are "entitled to use their prior experience" to "reduce ... the number of hours claimed in attorney fee requests." *Saxton,* 3 F.3d at 1521; *accord Slimfold Mfg. Co.,* 932 F.2d at 1459 (noting that "a district court itself has experience in determining what are reasonable hours ..., and should rely on that experience and knowledge if the documentation is considered inadequate").

Petitioners "bear [ ] the burden of proving that the number of hours submitted is reasonable, and this is usually done by

submitting documentation of hours actually worked." *Wasson*, 988 F.2d at 131, 1993 WL 18492; *accord Hensley*, 461 U.S. at 437, 103 S.Ct. 1933 (noting that the "fee applicant bears the burden of ... documenting the appropriate hours expended"); *Saunders ex rel. Saunders v. Sec'y of HHS*, 26 Cl.Ct. 1221, 1226 (1992) ("Petitioner's claim was disallowed because the proof was lacking.... [I]t remains counsel's responsibility to submit proof sufficient to support the point in issue."), *aff'd*, 25 F.3d at 1031. This documentation should be complete at the time a petitioner submits an application for attorneys' fees. *Wasson*, 24 Cl.Ct. at 484 n. 1. Moreover, prior to submitting a fee application, a petitioner "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary...." *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933.

### 2. Proceedings Before the Special Master

Petitioner requested that Mr. McHugh be compensated for 146.5 hours for his work on the case up through the submission of his initial application for attorneys' fees and costs and sixteen hours for his work preparing the amended reply in support of his fee application.[18] *Rodriguez*, 2009 WL 2568468, at *7. Respondent questioned both the reasonableness of the total hours billed by Mr. McHugh and the reasonableness of the time Mr. McHugh spent on certain, specified tasks. *Id.* at *7, 20. The only hours at issue here are those spent by Mr. McHugh on petitioner's posthearing memorandum. Petitioner requested that Mr. McHugh be compensated for forty-five hours to prepare the memorandum, which included ten hours to review and annotate the transcript of the one-day hearing. *Id.* at *20. The special master, after noting that petitioner did not file anything to support the number of hours claimed for this task, reduced the time allowed to twenty-five hours because "of the nature of the resulting project...." *Id.*

### 3. Analysis of Petitioner's Arguments

 In his motion for review, petitioner asserts that it was necessary for Mr.

McHugh to address both his Table claim and his causation-in-fact theory in the posthearing memorandum, that Mr. McHugh needed forty-five hours to adequately address both issues, and that forty-five hours is a reasonable amount of time to spend on this task. The special master disagreed with petitioner's assertion that forty-five hours was a reasonable amount of time to spend on preparing the posthearing memorandum, especially given the resultant product, and reduced the time allowed by twenty hours. The court cannot say that the special master's conclusion was error.

As with the determination of petitioner's attorneys' reasonable hourly rate, the determination of the reasonable number of hours expended by Mr. McHugh in representing petitioner was within the special master's discretion. *Saxton*, 3 F.3d at 1520. Moreover, the special master had the duty to exclude hours that were not reasonably expended by Mr. McHugh and was entitled to use her prior experience to assist her determination of how many hours were reasonably expended on a particular task, particularly when the documentation provided by Mr. McHugh was inadequate. *See id.* at 1521; *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933; *Slimfold Mfg. Co.*, 932 F.2d at 1459. The special master was intimately familiar with the facts and medical theories in this case and had experience from other cases from which to draw upon. Petitioner has not shown that the special master's reduction of hours was "based on clearly erroneous findings of fact, ... based on erroneous interpretations of the law, or ... clearly unreasonable, arbitrary or fanciful." *Cybor Corp.*, 138 F.3d at 1460. Thus, the special master's decision to reduce the hours allowed for the preparation of petitioner's posthearing memorandum was not an abuse of discretion.

### E. Objection Three: Observations Concerning the Advocacy of Mr. McHugh and Mr. Gaynor

#### 1. Special Master's Decision

Petitioner's third enumerated objection concerns the special master's use of the

---

18. Petitioner also requested that Mr. Gaynor be compensated for 22.4 hours for the work performed responding to the special master's July

17, 2008 order. *Rodriguez*, 2009 WL 2568468, at *7. These hours are not at issue here.

words "intemperate" and "ill-considered" in describing his attorneys' advocacy in one of the briefs supporting his application for attorneys' fees and costs. The special master described the commentary contained in petitioner's brief and the supporting declarations in the following manner:

> In their [reply in support of petitioner's supplemental attorneys' fees application], both Mr. McHugh and Mr. Gaynor engaged in intemperate and ill-considered attacks on respondent's filing in opposition to the supplemental fee application, calling it "entirely devoid of merit." They assert that respondent wasted public funds by challenging the hourly rate Mr. Gaynor demanded in the [supplemental fee application]. The declarations of Mr. McHugh and Mr. Gaynor, attached thereto, complain that respondent engaged in unprofessional conduct by commenting on the lack of support in Martindale–Hubbell for Mr. Gaynor's assertion of his "AV" rating. Mr. McHugh bitterly complained that respondent's expert filed a deceptive opinion, and Mr. Gaynor claimed respondent filed a "merit less" brief.

*Rodriguez*, 2009 WL 2568468, at *10 (citations & footnotes omitted). She then elaborated on Mr. McHugh's and Mr. Gaynor's commentary, beginning with the accusation that respondent wasted public funds:

> The costs of litigation are certainly an appropriate consideration for respondent in deciding whether to challenge a fees request. However, the cost of litigation is not the only factor. Respondent may well determine that a challenge to Mr. Gaynor's rate of compensation now will result in ultimate savings if a special master determines that lower hourly rates are warranted for Mr. Gaynor's services. In any event, the decision to challenge a fee request is solely within the purview of respondent, and Mr. McHugh's and Mr. Gaynor's observations are simply not well-taken.

*Id.* at *10 n. 30. Turning to the Martindale–Hubbell rating issue, she remarked:

> Petitioner conveniently overlooks the fact that it was Mr. Gaynor who raised the subject of his Martindale–Hubbell AV rat-

ing without ever checking the on-line website reflecting his professional credentials with Martindale–Hubbell. It was Mr. Gaynor's responsibility to ensure that his professional credentials were correctly reflected and respondent cannot be faulted for reporting what she found.

*Id.* at *10 (citation omitted). Finally, with respect to the comments concerning respondent's expert, the special master noted that "Mr. McHugh's personal attack on respondent's expert witness is likewise unfounded, and unfortunately, reflects back to his own expert's entirely unwarranted personal attack on this same expert's credentials during the litigation of the entitlement phase of this litigation." *Id.* (footnote omitted). With respect to her statement that the attack was "unfounded," the special master explained:

> Although the petition alleged both a Table injury and an actual causation claim, if petitioner's expert addressed the Table injury claim in his initial report, he did so in such an oblique manner that his contention escaped my very careful review. Respondent's expert's report focused solely on the actual causation claim made by petitioner's expert in his initial report in this case. Mr. McHugh's comments about respondent's expert ignores the decided difference between the medical term "encephalopathy" and the Table definition of the type of encephalopathy required to demonstrate a Table injury.

*Id.* at *10 n. 31.

### 2. Analysis of Petitioner's Arguments

 Petitioner contends that the special master's observation that Mr. McHugh and Mr. Gaynor "engaged in intemperate and ill-considered attacks on respondent's filing" constituted an unwarranted public reprimand of his attorneys that will damage their reputation and could chill vigorous advocacy in future Vaccine Act litigation. He then asserts that each of the special master's characterizations of his brief and his attorneys' declarations are without factual or legal basis. First, petitioner argues that the descriptions of respondent's brief as "entirely devoid of merit" and "merit less" cannot be considered to be "intemperate and ill-considered

attacks" because the descriptions were followed by supporting legal argument and the special master found some of respondent's arguments to be unpersuasive. Second, he asserts that it was perfectly logical and reasonable—not intemperate—to point out that the amounts incurred by the public in litigating attorneys' fees, when the amount at issue was $2,587.10, made no economic sense. Third, petitioner contends that, with respect to respondent's comments concerning Mr. Gaynor's Martindale–Hubbell rating, Mr. Gaynor did not accuse respondent of unprofessional conduct in his declaration, and that the statements in Mr. McHugh's declaration cannot be construed as accusations of unprofessional conduct. Fourth, he argues that Mr. McHugh's comments about respondent's expert's opinion were based in fact; in particular, the expert's testimony at hearing and criticism of the expert by another special master. Based on these contentions, petitioner asks the court to find that the special master's remarks were unfounded.

As a threshold matter, the court must consider whether it possesses jurisdiction to review and set aside the special master's comment that Mr. McHugh and Mr. Gaynor "engaged in intemperate and ill-considered attacks on respondent's filing. . . ." There is no question that the special master's remarks were not accompanied by any language sanctioning the attorneys. Nor did the special master invoke any ethical rules or rules of professional responsibility. Her remarks were merely criticisms of the attorneys' commentary. Thus, they cannot constitute, as petitioner contends, a public reprimand. *See Precision Specialty Metals, Inc. v. United States*, 315 F.3d 1346, 1353 (Fed.Cir.2003) (describing a reprimand as "explict," "formal," and "imposed as a sanction"); *see also Nisus Corp. v. Perma–Chink Systems, Inc.*, 497 F.3d 1316, 1320 (Fed.Cir.2007) (explaining that a "formal judicial action" would be something equivalent to "an explicit reprimand or the issuance of some mandatory

directive"). In fact, the rules of this court do not provide the special master with the authority to impose a public reprimand.[19] Consequently, this court lacks the jurisdiction to review the special master's remarks. As the Federal Circuit explained in *Nisus Corp.*, "a court's order that criticizes an attorney and that is intended to be 'a formal judicial action' in a disciplinary proceeding is an appealable decision, but . . . other kinds of judicial criticisms of lawyers' actions are not reviewable." 497 F.3d at 1320.

■ Even if the court possessed jurisdiction to review the special master's remarks, it would overrule petitioner's objection in all but one respect. As an initial matter, the court notes that the terms "intemperate" and "ill-considered" do not carry the grave meanings that petitioner contends. An "intemperate" attack is one that is not "[m]oderate in degree or quality[.]" *The American Heritage College Dictionary* 721, 1419 (4th ed.2004). An "ill-considered" attack is one that is made without "careful thought[.]" *Id.* at 305. The court concludes that the use of these terms will not seriously damage Mr. McHugh's or Mr. Gaynor's reputations or chill vigorous advocacy in Vaccine Act litigation. Indeed, such language has been used in the past without the ill effects feared by petitioner and his attorneys. In *Plavin ex rel. Reiss–Plavin v. Secretary of HHS*, the Court of Federal Claims characterized certain arguments advanced by the petitioners as "irresponsible and intemperate attacks upon the special master" that were "wholly without merit." 40 Fed.Cl. 609, 623 (1998). The Court of Federal Claims remanded the case to the special master to decide certain, discrete issues. *Id.* at 625. In its decision after remand, the Court of Federal Claims repeated its admonition that "petitioners' irresponsible and intemperate attacks upon the special master [were] wholly without merit," and further warned "petitioners' counsel . . . to cease their repeated attempts to discredit the Special Master," noting the impropriety

---

**19.** The Court of Federal Claims recently amended the Vaccine Rules, effective January 11, 2010, to grant special masters the authority to "order a party, its attorney, or both to pay the reasonable expenses—including attorney's fees—incurred because of any noncompliance with a scheduling

or other pretrial order unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust." Vaccine Rule 5(c)(1). However, this authority is limited to monetary sanctions, and does not extend to formal public reprimands.

of personal attacks on any jurist. *Plavin ex rel. Reiss-Plavin v. Sec'y of HHS,* 41 Fed.Cl. 671, 674 (1998), *aff'd,* 184 F.3d 1380 (Fed.Cir. 1999). Despite the remarks by the Court of Federal Claims, however, petitioners' attorneys in that case, Robert T. Moxley and Richard Gage, continued to represent petitioners in Vaccine Act litigation, and the court is unaware of any resulting decrease in vigorous advocacy on behalf of petitioners.

Furthermore, most of the special master's comments—which, the court reiterates, were directed almost entirely at the advocacy contained within, and in support of, just one of the briefs supporting petitioner's application for attorneys' fees and costs—were supported by the record and sufficiently explained in her decision. First, the description of respondent's brief as lacking any merit whatsoever was demonstrably unfounded. Second, there were perfectly legitimate reasons for contesting the hourly rate sought by petitioner for Mr. Gaynor's services. Third, Mr. McHugh's assertion that respondent called Mr. Gaynor's honesty into question certainly qualifies as an accusation of unprofessional conduct. And fourth, Mr. McHugh's comments about respondent's expert were belied by the expert's report, testimony, and credentials.

The one remark made by the special master that is not supported by the record is the contention that Mr. Gaynor accused respondent of unprofessional conduct in his declaration. Petitioner is correct that there is no such accusation in Mr. Gaynor's declaration. However, the court notes that Mr. Gaynor signed the brief at issue, which contained the following language:

> Finally, in a desperate attempt to avoid the modest fees sought for Mr. Gaynor in this case, respondent inserts a footnote [in her opposition brief] designed to convey that Mr. Gaynor had *lied* about his professional credentials, and is really not an AV-rated attorney.
>
> Before inserting this implicit, baseless accusation, respondent might have contacted Mr. Gaynor, or telephoned Martindale-Hubbell.

Pet'r Reply Mem. Supp. Supplemental Application Attorney Fees 8–9 (citation omitted).

Such language could be construed as an accusation of unprofessional conduct. Accordingly, the special master's improper attribution of an accusation of unprofessional conduct to Mr. Gaynor's declaration is, at most, a *de minimis* error. Therefore, the court dismisses petitioner's third objection to the special master's decision.

## IV. CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART** and **DENIES IN PART** petitioner's request for judicial notice and **DENIES** petitioner's motion for review. Pursuant to Vaccine Rule 30(a), the clerk is directed to enter judgment in accordance with this decision.

**IT IS SO ORDERED.**